**TOOL RESEARCH AND ENGINEERING CORPORATION, Plaintiff,**

v.

**HONCOR CORPORATION, Defendant.**

**No. 985–61–EC.**

United States District Court
S. D. California,
Central Division.

Sept. 11, 1964.

Judgment, Findings of Fact and Conclusions of Law, Oct. 13, 1964.

Mahoney, Halbert & Hornbaker, Thomas P. Mahoney, George H. Halbert, Robert D. Hornbaker, Los Angeles, Cal., for plaintiff.

William Douglas Sellers, Pasadena, Cal., for defendant.

CRARY, District Judge.

Plaintiff seeks judgment declaring infringement by defendant of Green-Hagan Patent No. 2975263, sometimes referred to as Pat. '263, application filed July 6, 1954 and issued March 14, 1961, and Anspach Patent No. 2951145, sometimes referred to as Pat. '145, application filed April 28, 1958 and issued August 30, 1960. The alleged infringing devices are defendant's machines, known as Honcor machines numbered 1, 2 and 3. Plaintiff also asserts that defendant willfully and wantonly infringed both patents involved.

Defendant denies infringement of either patent except the infringement by Honcor No. 2 of claims 5 and 6 of Pat. '145, which defendant admits, and alleges the invalidity of both patents by way of affirmative defense. Defendant also alleges fraud on the part of plaintiff in the procurement of Pat. '263.

Defendant received notice of infringement of both patents. Pat. '263 was for "Method For Producing Honeycomb Structures" and Pat. '145 was for "Method and Apparatus For Fabricating Honeycomb Core." Plaintiff has been and now is the owner of patents '145 and '263 and is the assignor of John J. Foster Mfg. Co. Mr. Hagan, now an officer of

plaintiff, was a partner in Foster Co. in 1949.

It appears that there are three initial questions to be answered as to each patent, to wit:

1. Is either patent infringed by Honcor machines 1, 2 and 3, or any of them? (Defendant admits Claims 5 and 6 of Pat. '145 are infringed by Honcor machine No. 2.)

2. Is either patent invalid by reason of no invention over prior art?

3. Is either patent invalid by public use or sale more than one year prior to the filing of the respective applications?

Claims 1, 2, 3 and 4 of Pat. '263 are allegedly infringed, and Claims 5 and 6 of Pat. '145 are allegedly infringed. Plaintiff, during trial, withdrew its allegations of infringement of Claims 1 to 4, inclusive, of Pat. '145.

The validity of Pat. '263 will first be considered. '263 is a *method* patent. It is admitted by plaintiff that the apparatus portrayed in Figures 7 and 8 of the patent did not make core.

Addt'l Claims 14 and 15 were applied for on June 28, 1957, by plaintiff, re Pat. '263, and, after Interference hearings, were allowed by the Patent Office and became Cls. 1 and 2 of '263. Cls. 14 and 15, as sought by plaintiff, provided for use of pre-formed or pre-corrugated core in the making of welded stainless steel honeycomb core as disclosed by claims and specifications in the original application for Pat. '263.

Plaintiff asserts that the method for use of pre-formed foil was a different and *second* method from that disclosed in the original application for the making of honeycomb core with flat sheets of foil, sometimes referred to as the flat pack method of making core. The court, after full consideration of all of the evidence, concludes that there was but *one* method disclosed by the patent and that, "with said method", as used in column 3, lines 26–30, of the specifications of Pat. '263 re production of already expanded core, is the method taught by the patent for the making of core by the flat pack method. Defendant asserts that but one method is taught and urges that the one method so taught *does not* disclose adequate method for making of core with pre-formed foil. The court concludes that the patent application, '263, as originally filed, does disclose adequate method to make pre-formed core to one skilled in the art and is sufficient to support Claims 1 and 2, of '263, as noted above. It follows from this conclusion, as to disclosure, that public use or sale of *pre-formed core,* to make Pat. '263 invalid, would have to antedate July 7, 1953, which the court finds did not occur. In the circumstances it must be determined whether there was public use or sale of welded stainless steel core manufactured by plaintiff from flat sheets of foil, the flat pack method, more than one year prior to July 7, 1954. (35 U.S.C. § 102 (b))

Some time after 1955, Mr. John J. Foster prepared and John J. Foster Mfg. Co. published and distributed to numerous firms in the manufacturing industry a brochure entitled "Squarcel Stainless Steel Honeycomb," defendant's Exhibit V, wherein he stated:

"John J. Foster Mfg. Co.'s reputation is founded on its development and fabrication of thermal insulation for jet aircraft and its stainless steel core division has been producing stainless steel honeycomb core for aircraft since 1952."

Mr. Foster, when asked about this statement, testified, " * * * so if I could use the words 'have been manufacturing stainless steel honeycomb core for aircraft since 1952' it would be to me the same words there. It doesn't mean it is a production type process."

Mr. Foster further testified that the core sold and given away by Foster Company in 1952 and early 1953 was for test purposes *by the vendee or donee companies,* but the evidence considered as a whole does not disclose that after Foster Company set upon the use of the flat pack method for the second time in 1952 or early 1953, following some experimental making of core with pre-formed

foil, there was any change in the *method* of making core with flat sheets of foil until pre-formed core was produced for sale sometime after July, 1953. For sales of welded stainless steel core sold to Convair Company, General Electric Company, Boeing, and Narmco, Inc., in early 1953, see Invoices, defendant's Exhibits I, J, K and L. These sales were without limitation as to secrecy, or otherwise, by Foster on the use of the core sold, and without any obligation to Foster to report upon what had been done with the core purchased.

Mr. Hagan, one of the inventors of Pat. '263, stated welded stainless steel honeycomb core was made in 1952 and early 1953 by the method disclosed by Figures 1, 2 and 3 of Pat. '263, and that this was after report from Forest Products Laboratory re maximum efficiency of cellular structure approaching square configuration. Mr. Hagan also testified that Foster, after various trials re making core, went back to the flat pack method a *second* time in 1952 and that it was *this method* they adopted to make core. These trials, he said, were in sequence, hexagonal (using pre-form), flat pack (using flat sheets), square (using pre-form) and back to flat pack, all of which occurred in 1952 or the fore part of 1953.

Foster Company, early in 1953, made core by the flat pack method and had it available for sale and delivery but did not have welded pre-formed core it could deliver, in that Foster Company did not know how to make pre-formed core at that time in production quantities.

Plaintiff may have been making welded stainless steel core after July 6, 1953, using varied gauges of foil and varied widths of core and size of cell but there was no change or experimentation by plaintiff in the *method* of making flat pack core from the time it went back to the making of core by that method the second time in 1952 until it started to manufacture pre-formed core in production quantities in 1955 or 1956.

A great deal of money was spent in the years following July 6, 1953, by various firms in the building of automatic core machines, and these machines, of course, expedited the manufacturing of welded honeycomb core. However, we are here concerned only with the public use and sale of core manufactured by the method disclosed in Pat. '263. Plaintiff argues it had no production facilities in early 1953, yet Mr. Foster testified that in early 1953 his company was making and selling core of different sizes and dimensions. At that time, he further testified, the core produced for sale for testing and evaluation was primarily of the flat pack method and that they did not have the method of producing pre-formed core developed at approximately that date. They had core made by the flat pack method that they could deliver but did not have any pre-formed core they could deliver. They didn't know how to make pre-formed core in production quantities or how to manufacture it. [R. 526, line 10, to R. 528, line 5.]

In defendant's Exhibit U, a general discussion re welded stainless steel core and analysis and data re various types of steel, the Foster Company notes that research and development "on this *core material*" (emphasis ours) are in their infancy. Although testing of *core material* was going on at that time, there is no evidence that there was any experimenting as to the *method* (flat pack) patented in '263, which *method* was for a second time adopted by plaintiff's assignor in 1952 and thereafter used as a *perfected method* of making core. On the first page of its "General Outline of Titanium and Stainless Steel Honeycomb Core," dated November 14, 1958, Foster Co. points out that "In the summer of 1952 our company introduced resistance welded stainless steel honeycomb core to the aircraft industry." Foster Co., of course, used its flat pack method to make core of any and all materials and types and classes of steel that would be most acceptable to industry market wise.

It appears to the court from the evidence in the case that there was public use and sale by plaintiff of welded stainless steel core made by the very method patented under '263 more than one year

prior to July 6, 1953, and not public use and sale of core made by a method in the experimental stage but by a method in a *perfected state*. Many thousands of dollars worth of core were sold by plaintiff from the latter part of 1952 to 1956 made by the same flat pack method ('263) which plaintiff adopted in 1952, or at least in early 1953, as its standard method of production *following* a period of experimentation by the patentees during which plaintiff made core with flat sheets of foil on two sets of fingers and with pre-formed foil, first on one set of fingers and later on two sets of fingers. Plaintiff did not offer evidence to show that the method it used in manufacturing core after it returned to the flat pack method in 1952 was experimental *on its part* as that term is applied by the courts. If this method had been changed or core delivered to customers in secret with intent on the part of plaintiff to make changes *in its method*, plaintiff's able counsel would have included such evidence as a part of plaintiff's case, and we must remember that the burden is on the plaintiff to prove by convincing evidence that the welded stainless steel core sold to the public prior to July 6, 1953, was made by a method in experimental stage of development. Smith and Griggs Mfg. Co. v. Sprague, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887), involved a machine for making "levers of buckles used almost exclusively on 'artic' overshoes." The question there involved, which is pertinent to the instant case, was whether the provisions of the then prior use or sale statute had been violated. The critical period of prior public use or sale in 1887 was two years prior to the filing of the application of the patent in suit. At pages 256–257 of its opinion, 8 S.Ct. at page 126, the court states:

> "A use by the inventor, for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its

use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal and not the incident must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment. Where the substantial use is not for that purpose, but is otherwise public, and for more than two years prior to the application, it comes within the prohibition.

> \* \* \* \* \* \*

> "On the other hand, the use of an invention by the inventor himself, or by another person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded in this court as such a public use as under the statute defeats his right to a patent." [Citing cases]

In commenting on the burden of proof of a plaintiff re experimentation during prior public use or sale, the court, in the Smith case, at page 264, 8 S.Ct. at page 130, observes:

> "In considering the evidence as to the alleged prior use for more than two years of an invention, which, if established, will have the effect of invalidating the patent, and where the defense is met only by the allegation that the use was not a public use in the sense of the statute, because it was for the purpose of perfecting an incomplete invention by tests and experiments, the proof on the part of the patentee, the period covered by the use having been clearly established, should be full, unequivocal, and convincing."

The Smith and Griggs Mfg. Co. v. Sprague case, supra, was cited in Aerovox Corp. v. Polymet Mfg. Corp., 67 F. 2d 860 (2nd Cir. Dec.1933), at pages 861 and 862. One of the issues there involved was prior public use or sale and the court, at page 861, observes, re the bur-

den of proof on the patentee that the public use or sale was by way of experimentation:

"On that issue the patentee has the burden, once the use is proved, and he must establish it by stronger proof than in ordinary civil suits."

On page 862 of its opinion, the court says:

" * * * the plaintiff has certainly not shown by 'full, unequivocal and convincing' proof that the sales were mainly to test out the invention."

The court further observes at page 862:

"The true situation appears to have been that the invention was not in the experimental stage, if by that is meant that the inventor was testing it with an eye to perfecting it. His work was done; indeed he had no technical knowledge with which to proceed, for he merely chanced on the idea. At most all that remained was to see whether it would work well under service conditions."

After commenting on the view that an inventor may test his patent, not only to put it into definitive form but to see whether his idea was worth exploiting, the court says, again at page 862 of its opinion:

"But this added privilege has its limit. If in so doing he does in fact exploit the completed invention commercially he takes a chance that he may lose his patent. It is not enough that he intends incidentally to test its value; he may not so reserve his rights; his primary purpose must be the test, though incidentally he may get what profit he can. This is the doctrine of Smith & Griggs Mfg. Co. v. Sprague, supra, 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141, and it has never been questioned."

A recent opinion of the United States Court of Claims in Ushakoff v. United States, 327 F.2d 669 (Jan.1964), concerned the interpretation of Title 35, U.S.C. § 102(b), referred to above. The court,

at page 672 of its opinion, says that an inventor is allowed to experiment with his invention and the law

" * * * permits such experimental use which is reasonably necessary to the perfection of the invention."

The court then quotes from page 256 of the opinion in Smith and Griggs Mfg. Co. v. Sprague, supra, being the first quotation from that case by this court in this memorandum, supra. In holding that § 102(b) had not been violated in the Ushakoff case, the Court of Claims, in referring to the "solar stills" (use of sun's energy to convert salt water to fresh water) sold to the Air Corps by Higgins Industries, states 327 F.2d at page 672 of its opinion:

"There was no pretense that they were ready for actual use as lifesaving equipment; in fact, changes were continually being made in the solar stills to overcome defects reported by the Air Corps."

█ The law is well established, as noted by plaintiff, that "the question of whether the use of an invention is experimental is basically a question of the intent of the patentee or the inventor." Citing Philco Corp. v. Admiral Corp., D.C., 199 F.Supp. 797. Intent re experiment *of the vendee* is not the test.

█ Only one sale is sufficient to bring a patent under § 102(b) and the patentee forfeits his right to the invention if he uses it publicly *himself* more than one year prior to the application for patent. Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92 at 94, 24 L.Ed. 68; Smith and Griggs Mfg. Co. v. Sprague, supra, 123 U.S. at page 256, 8 S.Ct. 122; Piet v. United States, D.C., 176 F.Supp. 576 at 581 and cases cited in footnote 12 and 584. The Piet case also holds, in substance, that where a sale is made with no restriction as to secrecy or conditions or limitations imposed as to use the sale results in public use (p. 582). See also Egbert v. Lippman, 104 U.S. 333 at 336, 26 L.Ed. 755 (1881) in support of this rule which was held to apply though the

product was a gift to the user by the inventor more than the then prescribed two years prior to applying for the patent.

■ It is also to be noted that a completed sale either with or without delivery is not required.

" * * * an offer to sell, made to a prospective purchaser after the experimental stage has been passed, the invention reduced to practice, and the apparatus manufactured in its perfected form, is placing on sale within the statute." Magee v. Coca-Cola Co. 232 F.2d 596 at 600 (7th Cir. 1956); Wende v. Horine, 225 F. 501 at 505.

■ Based on the evidence and pertinent authorities, the court finds that Pat. '263 was invalid by reason of the public use and sale more than one year prior to July 6, 1954. The foregoing finding makes unnecessary the determination of the question of whether Pat. '263 is infringed by Honcor machines 1, 2 and 3, or any of them. Pressteel Co., et al. v. Halo Lighting Products, Inc., et al., 314 F.2d 695 at 696 (9th Cir. Mar. 1963).

■ Is Pat. '263 invalid by reason of being noninventive under the prior art? The patent is, of course, presumed to be valid unless determined to disclose no invention over the prior art. Defendant contends that there is no invention which, in the case of '263, is not disclosed in the teachings of five allegedly prior art patents. The evidence does not disclose a patent which anticipates '263. The prior art patents relied on by defendant are:

| | |
|---|---|
| French Patent | 825,327 |
| Black | 2,065,511 |
| Smith | 2,324,435 |
| Young | 2,065,546 |
| Partiot | 2,445,801 |

The Smith '435 and Partiot '801 patents were cited in the file wrapper of the original application for '263 and presumably considered by the Patent Office.

The teachings of the French '327 patent are not sufficiently clear in the opinion of the court to be of any substantial assistance to defendant.

Black '511 teaches the utilizing of a plurality of pairs of welding wheels to secure two corrugated panels. There is no disclosure of the use of any type of fingers, electrode or otherwise.

Young '546 shows fabrication of metal building units by opposed pairs of welding wheels or rollers. There is no teaching of the steps of the method in '263.

Partiot '801 shows the securing of a plurality of sheets of steel by welding but does not teach the method disclosed in Claims 1 to 4 of Pat. '263. Neither does it appear to the court that the "Method of Making Flanged Elements", taught by the Smith Patent '435, is similar to that of Pat. '263.

■■ To be patentable a device composed of elements of prior patents, or conceptions or equivalents thereof, must produce a new, novel and surprising result not the product of ordinary professional skill. It is also true that a patent application cannot rely on the conception that invention lies in the use of the claimed equivalent which produces no new or unexpected result. Application of Lindberg, 194 F.2d 732 at 735–736, 39 C.C.P.A. 866 (U. S. Court of Customs and Patent Appeals, 1952).

■ The court does not conclude in the case at bar that a skilled artisan, in the making of welded stainless steel honeycomb core, could, having in mind the disclosures of the above numbered patents cited by defendant, obtain the method of making core as set forth in Claims 1 to 4 of Pat. '263 without some inventive advance. It appears to the court that there is a new and novel result and inventive faculty over the prior art sufficient to support Claims 1, 2, 3 and 4 of Pat. '263 and that Method Patent '263 was not invalid by reason of the prior art.

With respect to the validity of Anspach Pat. '145, application filed April 28, 1958, plaintiff contends the machine made under '145 automates Pat. '263. Defendant denies this and points out that

Mr. Anspach testified that his machine did not use the same method as '263.

Defendant cites, as constituting prior art invalidating '145, the Wegeforth Patent 2,843,722, application filed April 2, 1956, and the Wilson Patent 3,051,824, application filed January 10, 1958. It is said by defendant that by reason of said prior art there is no invention defined in Claims 5 and 6 of '145 over Patents '722 and '824.

Plaintiff asserts that the Wilson machine was inoperative and therefore could not invalidate '145. The evidence discloses that there was difficulty re the weld strength at the nodes in core manufactured by the Wilson machine but a substantial amount of pre-corrugated stainless steel honeycomb core was made with this machine in 1956 and the core so made passed the "core tests" of Convair.

Mr. William O. Fisher, a witness for defendant, testified that at a meeting in January, 1958, at the Foster Company, Mr. Foster stated that core made on the Wilson machine had met the Convair specifications "of the core itself" (R. 1445, line 5, to line 9, 1546). Mr. Fisher further stated Mr. Foster had said that before the core could be fully qualified for acceptance by Convair it had to go through the "brazed panel test" (R. 1547, line 21, to line 17, 1548). It does not appear that the "brazed panel test" had been made at the time of Mr. Foster's observation, but it does appear that the test of the nodal strength of the core itself was satisfactory.

Mr. Wilson, the patentee, testified his machine made core as much as eight hours a day at Foster Company but when he referred to his machine not working "quite satisfactorily (your satisfaction)" (Pltf.'s Ex. 72), he meant his machines did not run eight hours a day every day of the week in the fall of 1956. (R. 1316–1317 and 1325.) Wilson left the Foster Company in the fall of 1957. Although Mr. Foster testified the core made by the Wilson machine did not have satisfactory strength at the nodal welds, Foster Company had four of the Wilson machines built (R. 210–211 and 483). Mr. Hagan

stated one of the Wilson machines was modified to make one-eighth inch cell engine core and that he believed three pieces of this core were sold (R. 761, lines 16–18).

Plaintiff contends the welding finger and stripper plate (Claims 5 and 6) in Anspach '145 are inventive advances over the Wegeforth and Wilson patents.

Wegeforth '722 is cited in the file wrapper of application for '145 and presumed to have been considered by the Patent Office. However, the method and apparatus as to the parts pertinent to Claims 5 and 6 of Pat. '145, as shown by defendant's Exhibit H-3, are buried in the complicated Wegeforth drawings and disclosures. The consideration of Wegeforth '145 by the Patent Office is questionable because it was ordered added as a reference, responsive to amendment filed January 29, 1960, at the same time plaintiff's counsel was notified by the Patent Office that notice of allowance of '145 would be mailed. (Deft.'s Ex. B. p. 30.)

The court concludes from examination of the evidence that the extending of the welding finger (Pat. '145) to the rear node of the cell nor the size or shape of said finger were inventive advances over the prior art.

The "stripper plate" in the Hexcel machine appears to perform every function of the stripper plate of the Anspach machine. (Deft.'s Ex. H-3) The stripper plate in the Wegeforth machine has a larger opening through which the welding finger operates (Deft.'s Ex. H-1) than that in Anspach '145, but the court concludes that the stripper plate in Wegeforth '722 performs the same function as that in the Anspach '145.

Although there is evidence that the core made on the Wilson machine did not have satisfactory weld strength at the nodes, that machine was making pre-corrugated core before January, 1957, in substantial quantities (Deft.'s Ex. BO), and from a review of the evidence, including the portion noted hereinabove, the court concludes that the Wilson machine was operative. It does not appear

that Anspach '145 is inventive over Wilson '824 (Dept.'s Ex. H-2). The court concludes that plaintiff has not carried its burden of proof to establish Anspach had completed his invention prior to the filing of application for '824 on January 10, 1958, and the court further concludes, for the reasons hereinabove noted, that Claims 5 and 6 of the Anspach Pat. '145 are invalid as non-inventive over the prior art as contained in the Wegeforth and Wilson patents.

■ Was Pat. '145 in such prior public use or on sale in this country within the meaning of § 102(b) as to make it invalid? It follows from the ruling as to prior art re Pat. '145 that since the Wegeforth machine made precorrugated core for public use and sale commencing about October, 1954, and the Wilson machine was making core for the same purpose prior to January 10, 1957, that Pat. '145 is invalid by reason of the provisions of § 102(b).

The defendant also relies on public use and sale of pre-corrugated core not later than February, 1956, made by the Hexcel machine (Aug. 1955). (See Deft.'s Ex. H-2.) The Hexcel machine No. 2 was built in January, 1956. The evidence does not show that Claims 5 and 6 of Pat. '145 disclose any patentable features over which Hexcel machine (Deft.'s Ex. H-2) which was used publicly more than one year before April 28, 1958, the filing of the application for Pat. '145.

The above conclusions re invalidity make unnecessary the determination of the question of infringement of Claims 5 and 6 of Pat. '145 by Honcor machines 1 and 3, or either of them.

Defendant asserts the oath filed with the application for '263 fraudulently misrepresented that the flat pack method had not been in public use or on sale for more than one year prior to the filing of the application and fraudulently misrepresented in the specifications of the application that core in the already expanded condition had been produced "in accordance with said method." Although the court has found, as noted above, that there was public use and sale of core made by the patented method in violation of § 102(b), the court does not find that the representation to the contrary in the oath or the representation in the specifications re prior making of core in the already expanded condition in accordance "with said method" were fraudulently made.

The defendant is entitled to judgment in accordance with the above memorandum and plaintiff shall take nothing against defendant by the complaint. Attorney's fees are not allowed to the defendant.

Defendant's counsel is requested to prepare, serve and file Findings of Fact, Conclusions of Law and Judgment in accordance with Rule 7 of the Local Rules. In preparing Findings of Fact, please have in mind that the trial court is required to make findings only as to such ultimate facts as are necessary to reach the decision in the case. The testimony of witnesses and a superabundance of factual details need not and should not be included.

This Memorandum is not to be considered a final Judgment.